JOHN SEELEY WALLACE

*v.*

CYTHERA M. RAPPLEYE *et al.*

*Filed at Springfield March 28, 1882—Rehearing denied June Term, 1882.*

1. HEIRSHIP—*by contract—in respect to illegitimate child—degree and character of proof required.* Where there is an attempt to establish a verbal contract alleged to have been made by the putative father to make his illegitimate child an heir, by the testimony of the mother and other relations of the child alone, the evidence should be looked upon with great jealousy, and it should be weighed in the most scrupulous manner, to see what is the character and position of the witnesses generally, and whether they are corroborated to such an extent as to secure confidence that they are telling the truth. Such claims are always dangerous, and when they rest on parol evidence they should be strictly scanned, especially when an attempt is made, under cover of a parol contract, to effect a distribution different from that which the law makes.

2. SAME—*adoption of child so as to confer the right of inheritance—requirements of the statute.* Under the statute, where there are husband and wife, the wife's interest as respects herself or her children in the right of

|103   229|
|122   393|
103   229
126   138
103   229
130   456
103   229
132   322
|103   229|
|140   583|
103   229
148   110
|103   229|
|152   361|
|103   229|
|163   326|
103   229
76a   566

inheritance can not be affected by any act of adoption by the husband alone of another's child than their own, giving it the right of inheritance, but there must be consent of the wife thereto.

3. SAME—*contract as to heirship of legitimate child—without notice of a prior agreement.* Where a divorced husband, in consideration of the release of dower by his former wife in all his lands, covenanted with her that on his death his and her son should receive the portion of the covenantor's estate that he would be entitled to by the laws of the State as a lawful heir, it was *held,* that such covenant was binding, and was a bar to any relief in equity on behalf of an illegitimate child of the covenantor, claimed under an alleged prior verbal promise by him to the mother of such child to make the latter an heir. To affect the mother of the lawful heir, or what she purchased by her contract, she must have had notice of the prior agreement. She not having notice, her child would hold the favorable position of an innocent purchaser for value, without notice.

4. SPECIFIC PERFORMANCE—*degree of proof of verbal contract.* A specific performance of a verbal contract respecting real estate will not be decreed, except upon clear and conclusive proof of its existence and terms. The proof must be clear and explicit, leaving no room for reasonable doubt, and the contract must be certain, equal and fair.

5. SAME—*of the nature of the contract—and the consideration.* To make a contract the basis of a decree for specific performance, it must be certain, fair and just in all its parts, and be founded upon a valuable, as distinguished from a merely good or moral, consideration.

6. SAME—*unfairness, to defeat specific performance.* A contract of a putative father with his participant in adulterous intercourse, by which to deprive the injured wife and her lawful children of their rights of inheritance, and bestow them in whole or in part upon the spurious offspring of their adulterous intercourse, will not be specifically enforced by a court of equity, to the prejudice of the father's lawful heirs.

7. SAME—*matter of discretion—uncertainty—change of circumstances.* The specific performance of a contract, even when satisfactorily proven, is not a matter of right in the party, but a matter of sound discretion in the court, which grants or withholds relief according to the circumstances of each particular case. The uncertainty of a contract to make one an heir, as to the amount of the party's property to be affected, is a circumstance to be considered by the court in exercising this discretion, and so a change of circumstances in the parties may be considered.

8. CONSIDERATION—*illicit cohabitation.* An agreement in consideration of future illicit cohabitation between a man and a woman is void, and past cohabitation does not form an adequate consideration for a promise not under seal, even if it does when made under seal.

9. SAME—*of contract to support illegitimate child, and make it an heir.* A promise by a putative father to support his illegitimate child, may be

supported and sanctioned from his legal liability for such support, but there being no legal liability to make such child an heir, a promise or agreement to do so, made with the mother, must have a valuable consideration for its support. In such case the surrender of the child by the mother to the father, to be provided for, being beneficial to the mother rather than detrimental, and an inconvenience to the father, does not constitute a valuable consideration for an agreement of the father to make the child his heir at law.

10. STATUTE OF FRAUDS—*acts of the party in performance.* A court of equity interferes to enforce a contract within the Statute of Frauds only where there has been such acts of performance by the party asking relief, that he would suffer an injury amounting to a fraud by a refusal to execute the agreement. The right to relief in such cases rests not merely on the contract, but on what has been done in pursuance of the contract, and to prevent fraud.

11. The acts of a party, to take a case out of the Statute of Frauds, must clearly appear to have been done with a view to the agreement and upon its faith, and be such as would not have been done except for the agreement, and with a direct view to its performance. If the acts relied on might as well have been done with other views, and without the contract, they will not have the effect to take the case out of the statute.

12. SAME—*application of rule to particular case.* So, where, after an alleged parol agreement on the part of a father of an illegitimate child with the mother, to take and support the child and make it his heir, the mother gave up the child, which the father took and provided for, it was *held,* that the act of the mother in surrendering the custody of the child might as properly be referred to the father's agreement to take it and care for it in his own family as to his promise to make it his heir, and being for the mother's benefit, she could sustain no injury amounting to a fraud by a refusal to make the child an heir, and that such act of performance by the mother did not take the case out of the Statute of Frauds.

13. BASTARDY—*contract in respect to the child—as a bar.* In the absence of any settlement or release in respect of a matter of bastardy, a contract on the part of the putative father, with the mother, in anticipation of the birth of the child, that the father would adopt the child and make it his heir, would be no bar to a bastardy prosecution, or to an action for damages, in respect thereto.

APPEAL from the Superior Court of Cook county; the Hon. GEORGE GARDNER, Judge, presiding.

The appellant, John Seeley Wallace, a minor, by his guardian, Thomas Lord, on April 24, 1879, filed his bill for partition of real estate, against Frank R. Wallace, in her own right and as one of the administrators of their father's

estate, and Albert P. Smith, the other administrator. The property in question descended to John Seeley and Frank R. Wallace from their father, John S. Wallace, who died intestate, December 25, 1878. Frank R. Wallace answered the bill, and alleged that Cythera M. Rappleye was a tenant in common of the real estate, and filed a cross-bill containing the same statement, and that she had executed a deed conveying to Mrs. Rappleye an undivided one-sixth of all the estate left by John S. Wallace, and making Cythera M. Rappleye, and her husband, Nicholas B. Rappleye, defendants. Mrs. Rappleye filed an answer and a cross-bill, alleging that John S. Wallace was, during his life, married to three different women,—to Harriet E. Bivens, June 25, 1834, who died in 1853; to Sarah M. Rich, August 15, 1853, who died in 1857; to Celia W. Whipple, February 28, 1865, who was divorced from him April 9, 1872; that Frank R. Wallace was daughter by Sarah M., the second wife, and John Seeley Wallace, complainant in original bill, was son of decedent and Celia W. Wallace, his third wife, and that complainant in the cross-bill was born March 7, 1845, when deceased and Harriet E. Bivens were husband and wife, residing and cohabiting together at Valparaiso, Indiana, and that her father was John S. Wallace, deceased, and her mother Jane Slover, an unmarried woman; that decedent executed and delivered to complainant the following instrument in writing:

"MRS. CYTHERA M. RAPPLEYE,
*Wife of Nicholas B. Rappleye.*

"MY DEAR DAUGHTER: You were brought to me when an infant, and adopted as my daughter, with all the formality, as I believed, which was necessary to make you my lawful child, and entitled to be regarded as such. To show my unchanging affection for you, and my desire that no question may ever arise on this subject, I voluntarily, and with pleasure, declare you to be my daughter as much as if you were

so born, and I expressly desire that no question may ever be made relative to your rights as such. To this declaration I set my hand and seal, at Chicago, Illinois, this 27th day of February, A. D. 1877.

J. Seeley Wallace. [seal.] "

The cross-bill further alleges that an agreement was entered into between Mr. Wallace and her mother, Jane Slover, in which Mrs. Wallace concurred, in which agreement Jane Slover, on her part, agreed, in consideration of the promises then made by Wallace to her on his part, to surrender the custody, control and education of the child about to be born, to the said Wallace and his wife, Harriet E., and thereafter make no claim to the custody or control of the child, and in consideration of said promises, and of the fact that he was the father of complainant, and liable for her maintenance under the statute of Indiana, and to an action for damages, Wallace, on his part, promised Jane Slover that he would receive the child into his family and adopt it as his own child, and thereafter would educate and treat it as his own child born in lawful wedlock; and further, that the said child should be an heir, and receive such share of the real and personal property as he might be seized or possessed of at the time of his death, as if she had been the lawful child of himself and wife. The bill prays that her right may be ascertained, and a decree entered enforcing said agreement.

The answer of John S. Wallace, Jr., by his guardian, admits the giving of the paper of February 27, 1877, but denies that it was intended to interfere with the rights of the lawful children, and denies the agreement alleged in the cross-bill. By way of further defence he sets up an agreement made on the 10th day of April, 1872, between Mrs. Wallace, the mother of the respondent, and John S. Wallace, as follows:

"Whereas, on the 10th day of April, A. D. 1872, a decree was entered in the Superior Court of Cook county, on the chancery side thereof, in which Celia W. Wallace was complainant, and John S. Wallace was defendant, in and by which the marriage contract heretofore existing between said parties was decreed to be null and void, and in which said suit it was also decreed that said John S. Wallace shall secure to said Celia W. Wallace the sum of twenty thousand dollars ($20,000) upon certain real estate in the city of Chicago, payable in ten years, with interest semi-annually, at eight (8) per cent per annum. And whereas, said John S. Wallace is also to pay said Celia W. Wallace the sum of six thousand five hundred dollars ($6500) in cash, as alimony to said Celia W. Wallace, and in part consideration for the release of dower in the estate of said John S. Wallace, as well as for the maintenance of John S. Wallace, Jr., the son of the said John S. and Celia W. Wallace, the custody and care of said child being given to said Celia W. Wallace, and also for solicitor's fees and expenses incurred by said Celia W. Wallace in said suit:

"Now, therefore, in consideration of the foregoing payment, the said Celia W. Wallace is to quitclaim and release all her dower rights and interests in and to all the property of said John S. Wallace, wherever the same may be situated, and in consideration of the foregoing release, and for the purpose of composing the differences heretofore existing between the aforesaid parties, and to meet the wishes of the said Celia W. Wallace, the said John S. Wallace does hereby covenant and agree that any property, real or personal, of which he may be possessed at the time of his death, shall be so divided that his said son, John S. Wallace, Jr., shall have the same amount or portion of any and all such property belonging to said John S. Wallace at the time of his decease, as the said John S. Wallace, Jr., would take under the law of Illinois were said John S. Wallace to die intestate, and that the said

John S. Wallace, in any will now existing or hereafter executed by him, shall insert a devise or bequest in form proper to render the same effectual in favor of his said son, devising and bequeathing to him at his, said John S. Wallace's, death, the share and proportion of his estate, real and personal, hereinbefore specified, it being expressly understood that this agreement is not to be construed as the creation of a trust or use, present or future, in favor of said John S. Wallace, Jr., upon or in any estate which may now or hereafter belong to said John S. Wallace. It is also understood that the agreement shall in no way prevent the said John S. Wallace from making transfers, conveyances, sales, or other disposition of any property that he may now or become hereafter seized or possessed during his lifetime.

(Signed)          JOHN S. WALLACE.    (L. S.)"

The answer alleges that Celia W. Wallace did, at the time of entering into said agreement, execute and deliver to said John S. Wallace deeds of release of all her dower right in all the property of said Wallace, the total value of his property being about $500,000, and his real estate $300,000. The Statute of Frauds and Perjuries was also set up.

Upon the hearing the Superior Court of Cook county made a decree establishing the claim of Mrs. Rappleye to one-third of the estate, as claimed in her cross-bill. John Seeley Wallace, by his guardian, appeals from the decree.

It appears in the case that in the year 1844 one Jane Slover, a girl of fifteen or sixteen years of age, was living in the house of John Seeley Wallace, in Valparaiso, Indiana, employed as a hired girl in the family. Wallace had a wife, but no children. There was a criminal intimacy between Wallace and the girl, and near the end of the year 1844 it was ascertained that a child would be the result. Wallace made an arrangement for Jane to go to Chicago to give birth to the child, and all the expenses were borne by him. About the first of January, 1845, Jane was taken by her father to

Chicago, in pursuance of the arrangement made by Wallace. At this place, on the 7th of March, 1845, the child was born. It was left there, and Jane returned to her friends at Valparaiso. A short time after, Wallace and his wife went to Chicago, where they obtained the child, and took it home with them to Valparaiso. The child was thus received into the family and thereafter treated as a lawful child and daughter, and as such grew to womanhood in the family. The name of Cythera M. Wallace was given to her, and an entry was made by Wallace, in his own handwriting, in the family record, that Cythera M. Wallace was born March 7, 1845, and was the daughter of J. S. and H. E. Wallace. It seems to have been generally understood at Valparaiso that she was an illegitimate child. She was married November 9, 1864, to Nicholas B. Rappleye. Jane Slover married about a year after the birth of the child, and afterwards went to Kansas. Wallace, who had removed to Chicago, died intestate in December, 1878, leaving an estate of the value of between $300,000 and $400,000, and two legitimate children, Frank R. and John S., by his second and third wives. There was no question as to the execution of the two writings set out in the pleadings, and the release of dower.

Mr. H. B. HURD, for the appellant:

As to the great caution and distrust the parol evidence of parties' relatives is to be received in cases of this kind, counsel cited *Stewart* v. *Robertson*, 2 L. R. (2 Scotch and Divorce App.) 494; *Roxburgh* v. *Watson*, 7 McPher. 21; *Floyd* v. *Calvert*, 53 Miss. 37; *Marshall* v. *Peck*, 91 Ill. 187.

At most the evidence shows no more than an expression of an intention on the part of Wallace, with which the parties rested content. *Mannsell* v. *White*, 4 House of Lords cases, 1039.

If the terms of the alleged contract are uncertain or ambiguous, or not made out by satisfactory proofs, a specific

performance will not be decreed.    Story's Eq. Jur. secs. 764, 767, 769; *Graham* v. *Graham, Exr.* 34 Pa. 475; *Semmes* v. *Worthington,* 38 Md. 298; *Harder* v. *Harder,* 2 Sandf. Ch. 19; *McClure* v. *McClure,* 1 Pa. 374; *Johnson* v. *Hubbell,* 2 Stockt. 332; *Mundorff* v. *Kilbourne,* 4 Md. 459; *Stein* v. *North,* 3 Yeates, 324; *Sitton* v. *Shipp,* 65 Mo. 297; *Galbraith* v. *Galbraith,* 5 Kan. 402; *Walpole* v. *Orford,* 3 Ves. Jr. 420; *Smith* v. *Crandall,* 20 Md. 500; *Pigg* v. *Corder,* 12 Leigh, 69; Smith's Leading Cases in Equity, vol. 1, pt. 2, (note to *Lester* v. *Foxcraft,*) 1042; *Gould* v. *Mansfield,* 103 Mass. 408; *Purcell* v. *Miner,* 4 Wall. 517.

Nor except to subserve the ends of justice, and the court is satisfied that the application to it is fair, just and reasonable in every respect, founded on sufficient consideration, and without doubt on the proof as to any of its terms and motives.    Story's Equity, sec. 769; *Semmes* v. *Worthington,* 38 Md. 298; *Gosse* v. *Jones,* 73 Ill. 508; *Alexander* v. *Hoffman,* 70 id. 114; *Beach* v. *Dyer,* 93 id. 295; *Cusey* v. *Hall,* 81 id. 160; *Bowman* v. *Cunningham,* 78 id. 48; *Ralls* v. *Ralls,* 82 id. 243.

There must be mutuality.    *Sutherland* v. *Parkins,* 75 Ill. 338; *Semmes* v. *Worthington,* 38 Md. 298; *Gelston* v. *Segmund,* 27 id. 343; *Marble Co.* v. *Repley,* 10 Wall. 359; *Smith* v. *Crandall,* 20 Md. 500.

All the acts of part performance relied upon to take the case without the operation of the Statute of Frauds, must have been performed on the faith of the contract.    The acts done must be of a substantial nature, and such that the party would suffer an injury amounting to a fraud by the refusal to execute the agreement.    Story's Equity, sec. 762; *Semmes* v. *Worthington,* 38 Md. 298; *Sitton* v. *Shipp,* 65 Mo. 297; *Galbraith* v. *Galbraith,* 5 Kan. 402; *Gould* v. *Mansfield,* 103 Mass. 408; *Caton* v. *Caton,* L. R. 1 Ch. 137.

The contract between the deceased and Celia W. Wallace in favor of the complainant, is a bar to the relief sought.

MESSRS. LAWRENCE, CAMPBELL & LAWRENCE, and Messrs. LYMAN & JACKSON, also for the appellant:

Courts will not sustain even a deed based upon an adulterous intercourse carried on in the home of the wife between the husband and a female servant. Per Lord HARDWICKE, in *Priest* v. *Parrott*, 2 Ves. Sen. 160. And will not, in any case, enforce a mere parol contract based upon unlawful intercourse between the sexes. *Kyne* v. *Moore*, 1 Sim. & Stu. 62; *Matthew* v. *L——e*, 1 Madd. 300; *Beaumont* v. *Reese*, 8 Adol. & E. N. S. 485, (55 E. C. L. 483.)

To authorize a decree of specific performance there must be a valuable, as distinguished from a good or moral, consideration for the contract. *Colman* v. *Sarrell*, 1 Ves. Jr. 50; *Vasser* v. *Vasser*, 23 Miss. 382; *Peacock* v. *Monk*, 1 Mad. Ch. 413; 1 Ves. Sen. 133; *Underwood* v. *Hitchcock*, id. 280; *Minturn* v. *Seymour*, 4 Johns. Ch. 500; *Bland* v. *Cord*, 2 H. & G. 100; *Wadhams* v. *Gay*, 73 Ill. 415; *Hoig* v. *Adrian College*, 83 id. 267. Counsel insisted at length there was no consideration here.

If part of the consideration be illegal or immoral, a specific performance will be refused. *Featherstone* v. *Hutchinson*, Cro. Eliz. 199; *Waite* v. *Jones*, 1 Bing. (N. C.) 662; *Shackell* v. *Rosier*, 2 id. 646; *Howden* v. *Haigh*, 11 A. & E. 1036; *Barton* v. *Port Jackson Plank Road Co.* 17 Barb. 597; *Roby* v. *West*, 4 N. H. 285; *Carleton* v. *Nitcher*, 5 id. 196; *Carleton* v. *Woods*, 8 Foster, 296; *Collins* v. *Murell*, 2 Metc. (Ky.) 584; *Baldwin* v. *Palmer*, 6 Seld. 232; *Pettit* v. *Pettit*, 32 Ala. 288; *Rose* v. *Truax*, 21 Barb. 361; *Filson* v. *Harris*, 5 Barr, 452; *Crawford* v. *Morrell*, 8 Johns. 196; *Chandler* v. *Johnson*, 39 Ga. 85.

Statute of Frauds—part performance. 1 Story's Equity, sec. 762, citing *Caton* v. *Caton*, L. R. 1 Ch. App. 127; *Phillips* v. *Thompson*, 1 Johns. Ch. 131; *Semmes* v. *Worthington*, 38 Md. 298; *Frame* v. *Dawson*, 14 Ves. 387.

Mr. Wallace's agreement with Mrs. Celia W. Wallace was valid.  *Jones et ux.* v. *Martin,* 3 Aust. 882; *Logan* v. *Weinholt,* 7 Bligh, 53; *Johnson* v. *Hubbell,* 10 N. J. Eq. 335; *Izard* v. *Izard,* 1 Dessan, 116; *Wright* v. *Linsley,* 30 Mo. 40; *Gupton* v. *Gupton,* 47 id. 396; *Van Dyne* v. *Vreeland,* 11 N. J. Eq. 370; *Sutton* v. *Hayden,* 62 Mo. 101; *Davison* v. *Davison,* 13 N. J. Eq. 251; *Ridley* v. *Ridley,* 11 Jur. N. S. 475; *Parsell* v. *Stryker,* 41 N. Y. 485; *Laffers* v. *Shaw,* 3 Giff. 602.

Messrs. ELDREDGE & TOURTELLOTTE, also for the appellant, after discussing the evidence at considerable length, and its insufficiency, and making various points against the right to the relief sought, referred to the following authorities in general:  *Graham* v. *Graham,* 34 Pa. St. 475; *Semmes* v. *Worthington,* 38 Md. 298; *Stein* v. *North,* 3 Yeates, 324; *Sitton* v. *Shipp,* 65 Mo. 297; *Galbraith* v. *Galbraith,* 5 Kan. 40; *Pigg* v. *Corder,* 12 Leigh, 69; *Purcell* v. *Miner,* 4 Wall. 517; *Andreas* v. *Andreas,* 28 Ala. 43; *Perkins* v. *Wright,* 3 Harr. & J. 324; *Caton* v. *Caton,* L. R. 1 Ch. 137; *Gosse* v. *Jones,* 73 Ill. 508; *Beach* v. *Dyer,* 93 id. 295; *Casey* v. *Hall,* 81 id. 160; *Mercer* v. *Stark,* 1 Miss. 451; Story's Eq. Jur. secs. 751, 764, 770.

Mr. W. C. GOUDY, for the appellees, made the following among various other points:

A contract between the father of an illegitimate child with the mother for its support, education and right of inheritance, based on the consideration that the father is liable for the maintenance of the child and for damages, and the promise of the mother to surrender the custody of the child to the father, is a valid contract.  *Dalton* v. *State,* 6 Blackf. 401; *Allen* v. *Davison,* 16 Ind. 417; *Hook* v. *Pratt,* 78 N. Y. 376; *Bunn* v. *Winthrop,* 1 Johns. Ch. 337; *Ridley* v. *Ridley,* 11 Jur. N. S. 475.

That the consideration of the contract is good:  1 Parsons on Contracts, 427; Chitty on Contracts, 734; *Travinger* v.

*McBurney,* 5 Cow. 253; *Gray* v. *Mathias,* 5 Ves. 286; *Hall* v. *Palmer,* 3 Hare, 532; *Jennings* v. *Brown,* 9 Mees. & Wels. 495; *Binnington* v. *Wallis,* 4 Barn. & Ald. 650; *Allen* v. *State,* 4 Blackf. 125; *Abshire* v. *Mather,* 27 Ind. 282; *Thompson* v. *Nelson,* 28 id. 433; *Coleman* v. *Frum,* 3 Scam. 378; *Wright* v. *Bennett,* 2 Gilm. 590.

The agreement for the custody of the child is valid, and it is a consideration, even if by parol, or by unsealed writing. *Dumain* v. *Gwynne,* 10 Allen, 270; *Curtis* v. *Curtis,* 5 Gray, 535; *Van Dyne* v. *Vreeland,* 11 N. J. Eq. 370; *Sutton* v. *Hayden,* 62 Miss. 101; *In re Mitchell,* R. M. Charl. 496; *In re Murphy,* 12 How. Pr. 513; Hurd's Habeas Corpus, 540.

A man may bind himself to dispose of his estate in a particular way, and it will be enforced against his heirs after his death.          *Leeders* v. *Anstry,* 4 Ves. 501; *Laffers* v. *Maw,* 3 Giff. 592; *Prole* v. *Soady,* 2 id. 1; *Hammersby* v. *De Biel,* 12 Cl. & F. 45; L. R. 19 Eq. 174; L. R. 15 Eq. 121; 10 N. J. 335; 3 Sandf. Ch. 306; 41 N. Y. 485; 30 Mo. 396; 47 id. 40.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

The inquiries arising are, whether there is satisfactory proof of the making of the alleged contract set out in the cross-bill; if so, whether a court of equity will decree its specific performance, or what is equivalent thereto; and if this be found, whether the agreement in writing of John S. Wallace, made April 10, 1872, is not a bar to any relief as against the appellant.

The proof shows clearly enough that there was an arrangement between Wallace and Jane Slover whereby he was to take the child and support it, and bring it up in his family, and treat it as his legitimate child.   But was there in addition a contract touching the right of inheritance,—that the child should be an heir of Wallace, and receive such share of the real and personal property as he might be possessed of at the time of his death, as if she had been the lawful child

of himself and wife?   The only evidence to sustain this
alleged contract is that of Jane Slover herself, now Mrs.
Matthews, and Jacob Van Auken, the uncle of Mrs. Rappleye,
and all resting in parol.   We are cautioned by the authori-
ties to view testimony of the character of that here intro-
duced, with jealousy, and to scrutinize it closely.   The
language of Lord NEAVES in *Roxburgh* v. *Watson,* 7 McPher.
21, (quoted by Lord CAIRNS in *Stewart* v. *Robertson,* 2 L. R.
2 Scotch and Divorce App. 494,) speaking of the testimony of
near relations, is:   "It is incumbent upon the court' to look
upon such evidence with great jealousy, and to weigh it in
the most scrupulous manner, to see what is the character
and position of the witnesses generally, and whether they are
corroborated to such an extent as to secure confidence that
they are telling the truth.   Nothing would be easier than for
a vicious and designing woman to fasten a marriage on a
man by the evidence of her own relations and associates, and
this more particularly when the man was dead, and his
representatives are necessarily at a great disadvantage in
disproving the alleged fact, and detecting the imposture."
In *Graham* v. *Graham,* 34 Pa. St. 475, where there was a
similar alleged contract, and attempted to be sustained by
the mother and uncle of the complainant, in deciding the
case against the claimant Judge STRONG uses the following
language:   "Such claims are always dangerous, and when
they rest on parol evidence they should be strictly scanned,
especially when an attempt is made, under cover of a parol
contract, to effect a distribution different from that which the
law makes, or that which the decedent has directed by his
will, should it meet with no favor in a court of law.   Even if
any such contract may be enforced, it can only be when it is
clearly proved, by direct and positive testimony, and when
its terms are definite and certain.   The danger attendant
upon the assertion of such claims requires   *   *   *   that a
tight rein should be held over them," etc.   The most strin-

gent doctrines of the court should be applied in such cases. *Mundorff* v. *Kilbourn,* 4 Md. 464.

The deposition of Jane Slover, now Mrs. Matthews, was taken in the case at Joliet, in this State, March 27, 1880. She testifies that she went to Kansas from Valparaiso, and had resided in Kansas twelve years; that "before the birth of the child, and before I went to Chicago, I made an agreement with Mr. Wallace in regard to the child. He agreed to take the child, and adopt it as his own child, and care for it and educate it, and it should be his heir. That was the agreement. I agreed, under those circumstances, to give it up to them." She states that on inquiry of Mr. Wallace why he had done as he had, he said he wanted an heir. This is all her testimony substantially as to the making of the alleged contract. It came out upon her cross-examination that there was an affidavit or paper in relation to the matter, which she had before signed and sworn to; that she read this on the morning of her examination, and that she read it on the day before two or three times. In reply to the question what made her read that affidavit so many times, her answer was, "because I was so forgetful." She stated that she made the affidavit at Ft. Scott; that about three months before, Mr. Rappleye came to see her at Ft. Scott; that he was there three days, and had an interview with her on each of the days, and says, "can not tell you the day of the month that I first heard that affidavit read; think it was the second or third day after Mr. Rappleye came to my house. He had it with him when he came from Chicago. Understood from him he brought it from Chicago for me to sign and swear to it. Signed it just as it was written. What was in it was nothing more than what I have told you,—just the same. It is what Mr. Wallace promised to do."

Mr. Rappleye, however, testifies as to this: "I procured a paper, with the signature of Mrs. Matthews, in Fort Scott. I did not obtain from her more than one paper. It was

in my own handwriting. I asked the questions, and she answered them. It was prepared after I had a conversation with her. It was fore part of November, 1879."

If Mrs. Matthews' statement as to this paper writing be true, it excites suspicion whether the testimony she gives may not, to a greater or less extent, be drawn from the writing, rather than from her own memory. If the affidavit or paper writing was not gotten up in the way Mrs. Matthews' statement indicates, and she is mistaken in what she understood from Rappleye, this would be in impeachment of her memory. If her recollection is at fault with respect to an occurrence of only four or five months previous, can we have confidence that she is able to remember the particular language of a conversation had thirty-five years before? It appears, from the testimony of Mrs. Matthews, that after leaving the child in Chicago she had never spoken to it since, or had any communication whatever with the child, until meeting with Mrs. Rappleye at the taking of the deposition; that she had never since had communication with Mr. Wallace about the child, and that she did not know that she had any conversation with anybody about the child after she left it in Chicago, except with Mr. Van Auken, at the time when he came to take her away from Chicago. She states that when she discovered the fact of her pregnancy, "I felt very bad about it," and that said promise of Mr. Wallace in relation to the child being his heir, was made at the time of the first interview with him after such discovery, and that the same promise was subsequently repeated at different times.

Mr. Van Auken, the uncle of Mrs. Rappleye, at whose house in Joliet Mrs. Matthews came to have her deposition taken, and where Mr. and Mrs. Rappleye met her at that time, testifies as to a statement made to him by Wallace some time after the child was taken into the family of the latter. It is proper to note the manner in which the testimony of this witness as to an agreement that "the child

should be the heir" of Wallace, is brought out. He is first asked if Wallace made any statement in regard to any agreement he had made with Jane Slover touching the child, and if so, what he said. The witness answered that Wallace came to see him at his house in Joliet, and said he had heard witness was going to commence suit against him, and that he had made an arrangement with Jane, and did not want witness to do anything about it; that he and his wife had been after the child; "they were going to adopt it and bring it up as their own, and no one would know anything about it except a few that were living at Valparaiso, and he said that he wanted it for an heir to his property; he had no other heir but her, and he wanted the child—he wanted it as heir to his property." After then being asked what Wallace said Jane agreed to do, and answering that Wallace said that Jane had agreed to let him have the child, the witness is asked: "Now, what did he (Wallace) say that he had agreed to do?" Witness answered: "He said he had agreed to take the child and bring it up as his own,—to educate it and treat it as his own child, and he wanted it as heir to his property; that is the only heir that he had; that his wife had no children, and she probably never would have." But all this failing to come up to a contract that the child should be the heir of Wallace, witness is then asked: "Do I understand you to say that he had agreed with Jane that the child should be his heir?" and he answers, "Yes, sir, and Jane told me so." Words thus put into the mouth of a witness are less satisfactory, as declarative of the truth, than would have been his unprompted utterance. The particular agreement thus suggested is subsequently repeated by the witness. He was eighty years old, and testifying to a conversation had thirty-five years before. The foregoing is substantially all the testimony of this witness as to the alleged contract.

The testimony of Skinner, the clerk of Wallace at Valparaiso, and an intimate friend, is introduced, of statements of

Wallace, but it shows nothing of the alleged contract to make the child an heir. He testifies to conversations with Wallace near the time the child was born, and afterward, in regard to the child, and the testimony is no more than that Wallace said that the child should never want for anything; that he would take it as his own and adopt it; that if the child lived, the time would be when it would be worth more than all the Slovers, and that his wife was satisfied with the arrangement that the child should be there as his and her child.

The paper writing of February 27, 1877, given by Wallace to Mrs. Rappleye, comes short of showing the alleged contract. So, as before observed, the evidence for the establishment of the alleged contract to make the child an heir, or give to it any property, rests solely upon the testimony of the mother and uncle, and it is detailed above, substantially. Considering the relationship of these witnesses, the manner in which their testimony is educed, the improbability, from the lapse of time of thirty-five years, the subject meanwhile not having been called to the attention, of being able to testify with a reliable degree of accuracy as to the use, in a conversation occurring so long before, of particular phrases which are relied on here for establishing a case, such as "it should be made an heir," or "he would make it an heir," and the rule with respect to all verbal admissions that the evidence as to them, being the mere repetition of oral statements, ought to be received with great caution, it must be allowed that the testimony of those witnesses should be received with distrust as to the particular form of expression testified to. Aside from what these witnesses testify, the acts and declarations of Wallace do not favor his having made the particular contract which the cross-bill alleges, that he would make the child his heir. In his several conversations had with his intimate friend, Skinner, about the time the child was born, and after, in which he seemed to have expressed himself

freely in regard to what he was going to do for the child, there is no hint of such a contract.

It appears that on the 3d day of February, 1865, within three months of the marriage of Mrs. Rappleye, Wallace conveyed a piece of property in Chicago to a trustee for her benefit, the deed reciting that he was "desirous of providing reasonably for his beloved daughter." This property the trustee subsequently, at the request of the *cestui que trust* and Wallace, conveyed to one Derby, and he conveyed it to Wallace, and on the same day Wallace made a conveyance of a lot in Chicago to the former trustee for the benefit of Mrs. Rappleye, the deed containing the same recital as the former one. Subsequently, on September 14, 1865, he conveyed to Mrs. Rappleye another lot in Chicago, upon Wabash avenue, with a residence upon it. This would seem to be rather an indication of a moral feeling on the part of Wallace that he should make a reasonable provision for Mrs. Rappleye, and that what he did was a discharge of what he should do in the way of making a reasonable provision for her. The property conveyed seems to have been of the value of about $12,000. It is said that similar arrangements were made for the other children, and the provisions for all were nearly equal. We discover nothing in the record as showing provision for other children except a deed from one Andrews to Sarah M. Wallace, the second wife of Wallace, of property in Chicago, of date May 14, 1858, and a quitclaim deed of his interest in the property from Wallace to Frank R. Wallace, dated April 28, 1874, and a deed from Wallace to a trustee, of property in Chicago, in consideration of marriage about to be consummated with Celia Whipple, the third wife, in trust for Celia Whipple for life, remainder to any children of her by Wallace. These deeds at least contain no such recital as to providing reasonably for the children as does that for the benefit of Mrs. Rappleye.

The paper writing of February 27, 1877, given by Wallace to Mrs. Rappleye, would seem to have been framed as much in the interest of Mrs. Rappleye as the facts would allow, and that contains no trace of the alleged contract. The writing was drawn by a lawyer who testifies in the case, and to the conversation Wallace had with him at the time upon the subject, in which there is no statement of any such contract as is alleged. What Wallace said to the witness was, that he had agreed to adopt the child, and had adopted her. The written instrument which Wallace executed to Celia W. Wallace, April 10, 1872, does not accord with there being such a contract in existence.

It is unnatural, in the circumstances, that there should have been made a binding contract such as is alleged, understood and designed by the parties as being such, and the likelihood being that if anything was said as to the heirship of the child, it amounted at most but to words of expectation. The discovery of her condition of pregnancy alarmed and distressed the girl. The impending calamity of the exposure of her shame, and having an illegitimate child upon her hands, stood vividly before her, and at the first interview afterward had with Wallace, provision was made to meet the approaching event. It was arranged that the girl should go away to a distant city for her confinement; that Wallace should come to take the child home, and bring it up in his own family,—should adopt it. Must we not reasonably believe that this was all of the arrangement, substantially? It was at this interview Mrs. Matthews says the alleged contract was made. It was not the future of the child as to its right of inheritance which was the trouble and was to be provided for, but it was the present situation,—relief in respect of that was the pressing need, and was what was to be provided for. We can not suppose the unborn child's right of inheritance was in the thoughts of the parties, and

it is hard to believe there was intentionally a binding contract entered into securing it.

This court has said: "A court of equity should not in any case decree a specific performance, and divest the owner of land of his title, except upon clear proof." *Carver* v. *Lasater,* 36 Ill. 194, and *Gosse* v. *Jones,* 73 id. 509.

This rule as to the degree of proof in such case of a verbal contract affecting land, that it should be clear and conclusive, is familiar. In *Semmes* v. *Worthington,* 38 Md. 298, it was said, in such a case "the proof must be clear and explicit, leaving no room for reasonable doubt," and see *Purcell* v. *Miner,* 4 Wall. 517, that the complainant "should be held rigidly to full, satisfactory and indubitable proof." In *Walpole* v. *Oxford,* 3 Ves. 419, the Lord Chancellor laid it down as a general proposition that all agreements, in order to be executed in a court of equity, must be certain and defined, equal and fair, and proved in such manner as the law requires, and that it was enough to doubt in such respect to refuse relief.

We can not say that the alleged contract is established to the exclusion of a serious doubt, and with that satisfactory proof which is required by courts of equity in decreeing specific performance of contracts required by the Statute of Frauds to be in writing.

But were the existence of the contract established by satisfactory proof, specific performance will not be decreed of course. This is not a matter of right in the party, but a matter of sound discretion in the court, which withholds or grants relief according to the circumstances of each particular case. (1 Story's Eq. Jur. sec. 742; *Gosse* v. *Jones,* 73 Ill. 509.) To make a contract the basis of a decree for specific performance, it must be certain, fair and just in all its parts, and be founded upon a valuable consideration. 1 Story's Eq. Jur. sec. 769.

The only significance of a contract to make one an heir is in securing a right to property. But what is the amount of the property involved in such a contract? How much intestate estate will .be left to be inherited? Such a contract existing, suppose Wallace in his lifetime had given away his property, or made a will of it all to his two lawful children or to others, would that have consisted with the right under the contract? And if not, how much of his property might he have given or devised away, and how much must he have retained to satisfy the contract? The contract would be uncertain as to the amount of property reached by it. This is a circumstance to be considered in the exercise of the discretion of the court as to decreeing specific execution.

As respects consideration so far as the unlawful cohabitation might have entered into it, that would not support the contract. An agreement in consideration of future illicit cohabitation between the parties is void, and *past* cohabitation does not form an adequate consideration for a promise not under seal. Chitty on Contracts, 734; 1 Story's Eq. Jur. sec. 296.

Although agreements under seal which import a consideration have been sustained in such cases of *past* cohabitation, yet in *Priest* v. *Parrott*, 2 Ves. Sr. 160, in a case of adulterous intercourse, such as here, there was refusal to sustain even such an agreement under seal. An unlawful intercourse had taken place there between a married man and a servant in his own family, and he had given her a deed to secure an annuity, and Lord HARDWICKE refused to recognize its validity. In his opinion given, after adverting to instances where such agreements had been sustained, he observes: "But I know no case where the court has given countenance to these sort of bonds in a case of a married man, she (the woman involved) knowing it. That differs the case, because persons who submit to a temptation of that sort are without

excuse; they know absolutely they are doing a wrong which can not be recovered or healed, and which occasions mischief to families.   *   *   *   Had she not known that he was married, or if the wife was at a distance, or if any imposition was proved on her, it would be a different thing; but nothing of that appears in this case.  She entered into the family knowing it, and continued so as to occasion a separation; and this court ought to endeavor to preserve virtue in families." In the case of *Kyne* v. *Moore*, 1 Sim. & St. 61, Vice-Chancellor Leach upheld such a bond where it made provision for the children of the adulterous intercourse as well as for the woman, and in this respect of children, distinguished the case from that of *Priest* v. *Parrott*, and criticised the ground of the distinction in the latter case as to a married man.

Which of the two cases, so far as they differ, lays down the better rule in the case of an agreement under seal, it is not necessary to determine for the purpose of the present case, which is one of a verbal promise, as all the authorities agree that a verbal promise will not be enforced when given for illicit cohabitation.

There must have been a valuable, as distinct from a good or moral, consideration for the contract to entitle it to be specifically executed.  In *Vasser* v. *Vasser*, 23 Miss. 382, the court say:  "To render a contract for the purchase and sale of property (such as the agreement under examination) obligatory, it is essential that there should be a consideration of value paid to the party against whom it is to be enforced.  A consideration founded upon blood, or natural love and affection, will not be sufficient."  And see 1 Story's Eq. Jur. sec. 7936.

A promise for the support of the child would be sustained because of the legal liability for such support.  But Wallace himself rendered the support, and satisfied his whole legal

liability upon that score. The promise to make the child an heir was something over and beyond support. There was no legal liability to make it an heir, or moral obligation, so that there was no such legal liability, or even moral obligation, to support that promise.

We see nothing in the case which can plausibly be claimed as being in the way of a valuable consideration, more than the giving up the child to Wallace. Was this, under the circumstances, a valuable consideration? To make it such, it must have been something of benefit to Wallace, or of detriment to the mother. But instead of being beneficial to Wallace, the taking into his own family and bringing up of the child must have been to him a great inconvenience. To Jane Slover, in her situation, it would seem to have been rather a favor than otherwise—that she actually received a benefit, rather than suffered a detriment, from Wallace taking upon himself the care and support of the child. Is not this the proper judgment to be passed upon this transaction, viewed in the respect of constituting a valuable consideration as basis for specific performance? We do not think there is that in the case which should be recognized in a court of chancery as a sufficiently valuable consideration, within the requirement of its rule in such respect.

The suggestion is made that there was a legal liability to a bastardy prosecution for the support of the child, and to an action for damages,—that there was a settlement and release of such liability, and that this made a sufficient consideration. It is sufficient to say that nothing of this kind appears in the record. There is no evidence whatever respecting any such settlement or release, or that such liability was in the minds of the parties at all. Whatever of legal liability there was in the matter, remained subject to be enforced after the contract as well as before. The contract would have been no bar.

We are of opinion, too, there has not been the part performance here which is required in order to take an oral contract out of the operation of the Statute of Frauds. The contract being verbal, it is void by the Statute of Frauds, and a court of equity interferes to enforce such a contract only where there have been such acts of performance by the party asking relief that he would suffer an injury amounting to a fraud by the refusal to execute the agreement. In *Caton* v. *Caton*, 1 Law Rep. 1 Ch. App. 137, Lord CRANWORTH, speaking of parol contracts for sale of land, observed that the right to relief in such cases rests not merely on the contract, but on what has been done in pursuance of the contract, and to prevent a fraud. In *Setton* v. *Shipp*, 65 Mo. 297, the court say: "Courts of equity, when called on to decree a specific performance of an alleged parol agreement, are asked to exercise an extraordinary jurisdiction. They must be well satisfied of the existence and character of the agreement, and will always look to the substantial justice of the case. They must be satisfied that any resistance to the completion of the agreement alleged and proved would operate as a fraud on the other party." In *Frame* v. *Dawson*, 14 Ves. 387, speaking of such acts of performance, the Master of the Rolls said, the acts done must be such "that the party would suffer an injury amounting to a fraud by the refusal to execute the agreement." And see *Phillips* v. *Thompson*, 1 Johns. Ch. 148; 1 Story's Eq. Jur. sec. 761.

There is another rule in this connection, that the acts done should clearly appear to have been done solely with a view to the particular agreement sought to be enforced, and upon the faith of such agreement. The rule upon the subject is expressed in Story's Eq. Jur. sec. 762, as follows: "In order to make the acts such as a court of equity will deem part performance of an agreement within the statute, it is essential that they should clearly appear to be done solely with a view to the agreement being performed; for if they are acts

which might have been done with other views, they will not take the case out of the statute, since they can not properly be said to be done by way of performance of the agreement." Chancellor KENT says, in *Phillips* v. *Thompson,* 1 Johns. Ch. 131 : "It is well settled that if a party sets up part performance to take a parol contract out of the statute, he must show acts unequivocally referring to and resulting from that agreement,—such as the party would not have done unless on account of that very agreement, and with a direct view to its performance ; and the agreement set up must appear to be the same with the one partly performed. There must be no equivocation or uncertainty in the case." So, also, in *Semmes* v. *Worthington,* 38 Md. 298, the court say : "The act relied on as part performance must in itself furnish evidence of the identity of the contract; and it is not enough that it is evidence of some agreement, but it must relate to and be unequivocal evidence of the particular agreement charged in the bill."

Now, what thing to the injury of Jane Slover or Mrs. Rappleye has been done upon the faith of an agreement to make the child an heir of Wallace, whereby it would work a fraud on either of them to refuse to carry out such agreement? Mrs. Rappleye herself certainly has done nothing on the faith of such an agreement, as she avers in her cross-bill that she did not know of it until after the death of Wallace. As to Jane Slover, all the performance on her part is, that she let .Wallace have the child. ' This, as we have already remarked, may, in the circumstances, be reasonably deemed as beneficial to herself, Jane Slover,—that she let Wallace have the child because she did not wish the care and support of it, and not because Wallace had made the particular contract that the child should be his heir. We can hardly think anything was done on the faith of that particular agreement.

Can it, then, be asserted that from the leaving the child in the custody of Wallace, Jane Slover would suffer an injury

amounting to a fraud by refusal to execute the agreement to make the child an heir? What was done by Jane Slover does not, as the authorities require, unequivocally refer to the agreement to make the child an heir, and was not, we think, such as she would not have done unless because of such agreement. All that was done by her may be referred to, and finds full explanation in, the agreement of Wallace to take the child, to bring it up in his own family, to adopt it. The whole manifest purpose of the transaction was for the relief of Jane Slover, and for the transfer of the care and support of the child from herself to Wallace, and it can not reasonably be supposed that any promise as to heirship of the child had the least appreciable weight, in influencing the conduct of Jane Slover. What she did we may reasonably regard was in view of other promises by Wallace, which have all been fulfilled.

We do not think the acts shown here are such as a court of equity will deem a sufficient part performance of the alleged agreement, to exclude the operation of the Statute of Frauds. In this regard, as well as in other essential respects, the views we express are quite in harmony with the decision in the recent case of *Anderson* v. *Madison,* in the English Court of Appeal, 43 L. T. Rep. N. S. 334, and reported in 25 Albany Law Jour. 264.

There is in this respect of part performance and consideration a marked distinction between the case at bar and the three cases relied upon as the principal authorities on behalf of appellees, viz : *Van Dyke* v. *Vreeland,* 13 N. J. Eq. 371, *Sutton* v. *Hayden,* 62 Mo. 101, and *Allen* v. *Davison,* 16 Ind. 417. In the two former cases the promises were to the complainants themselves, and were to the effect that if they would live with the defendant in the one case, and the decedent in the other, the latter promised to leave all their property at their death to the complainants, and in consideration of the promises, and in reliance upon them, the com-

plainants lived with and performed many years of very valuable services and labor for the defendant and the decedent. The similarity in principle of these cases with the present would seem to be only in the respect of the character of the promise, and of indefiniteness and uncertainty as to the amount of property the contract would carry. In the Missouri case the defendant was the owner of a house and lot when the complainant came to live with the decedent, and to have this house and lot conveyed to the complainant was all the relief which was asked for under the contract. In the New Jersey case the bill was filed in the lifetime of the defendant, alleging he had made a fraudulent conveyance of his property for the purpose of defeating the agreement, asking that the fraudulent conveyance be set aside, and that the real estate conveyed (a certain farm) be held to secure the benefit of the agreement. The decision was upon a demurrer to the bill, where all the allegations of the bill were admitted, and the demurrer was overruled, and the complainant held to be entitled to some relief. Those cases were unlike the present not only in the respect of the agreements having been made with the complainants themselves, and the complainants having rendered many years of valuable services on the faith of the agreements, but the promises made, although general in their terms, to leave all the promisors' property at their death to the complainants, yet the promises, as sought to be enforced, respected but a single specific piece of property, a house and lot in the one case, and a farm in the other case, thus being entirely definite as asked to be enforced; and the particular pieces of property were both owned by the promisors at the time the promises were made, and so were in the contemplation of the parties as the subjects of the promises. In the proper exercise of the sound discretion of the court in decreeing specific execution, upon consideration of all the circumstances of each particular case, a decree of specific performance might well have been granted

in these two cases cited as to the property there involved, and be refused in the present case with respect to an estate acquired subsequently to the making of the promise, and of a magnitude thirty-fold greater than the whole property owned by the promisor at the time of the promise, and which could not reasonably have then been contemplated by the parties as the subject of the promise.

In the case of *Allen* v. *Davison*, the father of an illegitimate child, Davison contracted with one Simon Phillips, the father of the woman who gave birth to the child, that if Phillips would keep the child until it should be fourteen years old, Davison would convey to the child a certain piece of land. The agreement was in writing. Phillips kept the child for fourteen years, as he had agreed. The court enforced specific performance of the agreement for conveyance. Phillips had performed his part of the contract in furnishing the support of the child, which Davison, as father, was responsible for, and Phillips was entitled to compensation according to the contract,—a quite plain case for specific performance.

A contract, to be specifically executed, must be fair, just and reasonable. One kind of unfairness which stays the interference of the court, arises where the enforcement of the contract would be injurious to third persons. (Fry on Specific Perform. sec. 245.) The enforcement of such contracts as this would be productive of injustice to others—to the wife and lawful children. Had Wallace died in the situation he was at the time of the making of the alleged contract, to-wit, without lawful children, his wife, under our law, would have succeeded to one-half of his real estate, and all his personal property. But with this contract held valid, the illegitimate child would have taken the whole property, leaving to the wife only her dower right in it, and under the contract, if good, the two lawful children, as the case now is, take only one-third each, instead of one-half, which they would take without the contract. Now, is not the violation of the mar-

riage bed wrong enough to the lawful wife? Can the puta-
tive father and his participant in such conjugal offence, by
arrangement between themselves, thus deprive the injured
wife and her lawful children of their rights of inheritance,
and bestow them in whole or in part upon the spurious
offspring of their adulterous intercourse? And is a court of
chancery to interpose and lend its assistance for the carrying
out of such a purpose? To be sure, as the event has turned
out, the wife herself will not now be affected in her right of
succession, but she was liable to have been, and the lawful
children are affected in their right of inheritance in the
manner named. It is said there were no rights of inherit-
ance existing at the time the contract was made, and hence
the contract did not infringe any such rights; but the agree-
ment to make one an heir could have no effect until the death
of the party making the agreement, so that at the time the
contract was to come into operation in its effect, there would
be rights of inheritance in existence for it to affect. All there
was of the contract in efficiency, was in its operation upon
rights of inheritance when and at the time they arose.

By the common law an illegitimate child was incapable of
inheriting at all. It is suggested the reason of the rule grew
out of the feudal law, and was for the preservation of purity
of blood in the nobility, in whom the landed property was to
be kept. But Chancellor KENT, in his Commentaries, vol. 2,
p. 176, quotes Mr. Selden as saying, (note c to Fortescue
*de laud. leg. Ang.* Ch. 40,) "that not only the laws of England,
but those of all other civil States, excluded bastards from in-
heritance, unless there was a subsequent legitimation." Our
own statute has modified the rule of the common law to the
extent of providing for legitimation by subsequent marriage,
and allowing the illegitimate child to inherit from the mother,
but as to inheriting as heir to the putative father the rule is
otherwise untouched. The doctrine is one founded in public
policy, which has in view, as we conceive, partly, at least,

the discouragement of illicit commerce between the sexes, and the fostering of marriage and the sustaining of the interests of the family created by lawful marriage. There could be no adoption of a child to give it the right of inheritance at common law. There was no statute of adoption in Indiana or this State at the time the alleged contract was made, so the agreement to adopt had no force as giving the right of inheritance. We now have a statute under which a child may be adopted, and the right of inheriting be given to it. But even under this statute, where there are husband and wife, the wife's interest, as respects herself or her children in the right of inheritance, can not be affected by any act of adoption by the husband alone of another's child than their own, giving it the right of inheritance, but there must be consent of the wife thereto. The act of adoption under the statute is one of much solemnity. There must be petition in writing for the purpose, in which the wife must join, and the adoption must be authorized by decree of court. Can we allow this statute of adoption to be frustrated by carrying into execution a mere verbal agreement of the husband alone to adopt an illegitimate child? We think not.

A similar conclusion in this respect appears to have been come to by the Supreme Court of Iowa in the case of *Shearer* v. *Weaver*, 56 Iowa, 578. It appeared there, in an action for the partition of real estate, that one John P. Weaver had taken and brought up a child named Isaac Weaver, under a contract with the father of the child that he would take and keep the child as his own child, and would make him an heir, and that he should have an equal share with the daughter of John P. Weaver in his property. An adoption paper for the adoption of the child was afterward executed, but accidentally was not recorded until after the death of John P. Weaver, when it should have been recorded before his death to make the adoption complete under the statute of Iowa; that after the death of John P. Weaver defendant

Hawthorn purchased the land in controversy from Isaac
Weaver, as being an adopted son of John P. Weaver. The
circuit court found that defendant Hawthorn had no right in
the land, that the articles of adoption were invalid because
not executed as required by law, and not sufficient to consti-
tute Isaac Weaver an heir of John P. Weaver, and that
Hawthorn was not entitled to claim as heir by virtue of the
contract mentioned.   The Supreme Court, in its opinion
affirming the judgment, said:   "In our opinion rights of
inheritance can not be conferred by a parol agreement.
\* \* \* Our statute having provided specifically the means
whereby one sustaining no blood relation to an intestate may
inherit his property, the rights of inheritance must be acquired
in that manner, and can be acquired in no other way."

Change of circumstances may be regarded in exercising the
discretion as to decreeing specific performance.   (1 Story's
Eq. Jur. 750 a; *Bank of Alexandria* v. *Lynn,* 1 Pet. 376.)
At the time when the contract is alleged to have been made,
Wallace had no lawful child; at the time of his death he had
two lawful children.   At the time of the making of the con-
tract his whole property did not exceed $12,000; at his death
it amounted to at least $350,000.   What amount of property
had the parties reasonably in view under such a contract, as
to be given by it?   Would it be an amount to be fixed with
reference to the moderate property which Wallace possessed
at the time the contract was entered into, or the large estate
which he left?   Not what is the letter of the contract, but
what was reasonably in contemplation in the making of such
a contract, and what may be equitably demanded under it?
The provision which Wallace made for Mrs. Rappleye after
her marriage, by deed of real estate, in his expressed desire
to provide reasonably for her, was one in amount which
equalled his entire property at the time the contract was
made.   This may properly be considered, and whether, in
the view of a court of equity, it may not be looked upon as a

fair fulfillment of the requirement of such a contract, as answering all just expectations under it.

Eminent judges have questioned the wisdom of the assumption by the court of chancery of jurisdiction to decree the specific performance of verbal contracts declared void by the Statute of Frauds, expressing doubts whether its exercise had not been productive of more of harm than of benefit. We are hence admonished to be slow to exercise the power to carry into execution the verbal agreement of a putative father to invest his illegitimate offspring with the rights of inheritance, where the promise is not only in contravention of the Statute of Frauds, but in repugnance with the statutes of adoption and of descent.

But if a case for specific performance were made out, we are of opinion that the covenant made by Wallace to Celia W. Wallace, on April 10, 1872, should be held a bar to any relief as against this appellant. By that covenant with Mrs. Wallace, in consideration of the release by her of her dower in his estate, Wallace agreed that on his death, his and her son, the appellant, should receive the amount or portion of Wallace's estate that he was entitled to by the laws of Illinois. At the time, and ever, Wallace had only two legitimate children, the appellant and Frank R. Wallace, and it was the one-half of the estate that by the law of the State descended to appellant, and which this covenant secured to him. It is said that the estate which would descend would be only what was left after the payment and discharge of all debts and contracts against it, and so appellant, as heir, would take subject to the contract with Jane Slover to make her child an heir. But this is mistaking the position of appellant. He does not stand as a mere heir, a volunteer, but he stands in the position of a purchaser, the purchase price being Mrs. Wallace's right of dower. Her dower right was quite valuable. The divorce from Wallace being for his fault, did not affect her dower by our statute. This dower

right she parted with and released for this covenant, securing
to appellant the portion of Wallace's intestate. estate that he
would take under the laws of Illinois. The contract with
Jane Slover did not respect any property right which was to
be first satisfied, leaving but the remainder to descend, but it
was to constitute one an heir, to share as such in descendible
property in the remainder of the estate after satisfaction of
all claims against it. The covenant between Wallace and
Celia W. Wallace was made with reference. to heirs known to
and recognized by the laws of Illinois,—lawful heirs, not con-
tract made heirs. An heir made by contract was not known
to the law. The covenant did provide that Wallace should
not devise away any portion of appellant's share as heir, and
it would be equally within the spirit and intent of the cove-
nant that he should not contract it away by making another
person an heir. The effect would be the same to diminish
appellant's portion, whether a devisee was brought in by will,
or a co-heir was brought in by contract, to share in the
estate.

By the law of the State appellant takes as heir one-half of
the estate of Wallace. This contract with Jane Slover, if
enforced, would take away from him one-sixth and give it to
Mrs. Rappleye, as a co-heir, made such by the contract. The
covenant gives security and protection against this, and this
is what was purchased by Mrs. Wallace by the release of her
dower right. She knew nothing of this contract with Jane
Slover. To affect her, or what she purchased by the con-
tract, she must have had notice of it. She not having notice,
appellant is entitled to protection against the contract, as
being in the favorable position of an innocent purchaser for
value, without notice. Had it not been released, the dower
of Mrs. Wallace would have been taken out of the estate, and
the residue only distributed. Now, the dower being released,
the estate will be distributed free from dower, and in reality
the dower be distributed as part of the estate, so that if the

claim of appellant be allowed, she will, in effect, get a third part of Mrs. Wallace's dower, and also, in addition, all that was given to Mrs. Wallace in exchange for her dower. This would not be equitable. Courts of equity will not decree a specific performance in a case where such a decree would be inequitable under all the circumstances. 1 Story's Eq. Jur. sec. 769.

Upon the whole case, all the circumstances considered, we are of opinion that Mrs. Rappleye has not shown herself entitled to any relief, and that her cross-bill should have been dismissed.

The decree is reversed, and the cause remanded for further proceedings in conformity with this opinion.

*Decree reversed.*

Mr. JUSTICE SCOTT: I do not concur in this decision.

Mr. JUSTICE MULKEY, also dissenting.