WILL OF DEREG: RADKE, Appellant, vs. DEREG, Executor,
Respondent.

*May 12—June 22, 1925.*

*Executors and administrators: Agreement to leave property to illegitimate son: Mother as competent witness: Credibility of testimony: Denial of request for continuance: Discretion of court.*

1. The testimony of a mother on the issue as to the father's agreement to leave all his property to an illegitimate son must be harmonized with all the surrounding facts and circumstances and the actual physical situation to establish its credibility on the hearing of the son's claim against the father's estate. p. 427.
2. Such testimony is *held* so incredible and unworthy of belief as not to warrant the allowance of the son's claim against the father's estate, irrespective of whether she was a competent witness under sec. 4069, Stats., or not. p. 430.
3. Testimony as to the decedent's agreement to leave property to one making a claim against an estate must be scrupulously scanned and considered, in view of the great possibility for the perpetration of fraud. p. 430.
4. Where witnesses for whose production a continuance was granted did not appear at the hearing of applicant's claim against the estate, and no application was made for a continuance after claimant's counsel received a letter from them stating that they could furnish valuable evidence for claimant, and their affidavits were not produced on the hearing of an application, after a decision disallowing the claim, to reopen the case and grant a further hearing to permit their production, the court did not abuse its discretion in denying the application. p. 431.

APPEAL from a judgment and an order of the county court of Lincoln county: M. C. PORTER, Judge. *Affirmed.*

The appeal is from a judgment and an order denying claimant a new trial upon the ground of newly-discovered evidence.

*John Radke,* the claimant, was born on January 20, 1887, and at the time of the trial was about thirty-seven years of age. He was the illegitimate child of the deceased, John Dereg, and of Minnie Radke, now Mrs. Minnie White. The

deceased died in December, 1923, leaving what purported to be a last will and testament, and in January, 1924, upon an application duly made in that behalf and upon notice duly given, said instrument, by which all his property was devised and bequeathed to a brother, *Dennis Dereg,* was admitted to probate.   In February, 1924, a petition was filed by *Radke* praying that the order of the court admitting the will be set aside upon the ground that the deceased, at the time he executed the will, was insane and of unsound mind and memory, and on March 18th a rehearing was granted by the court.

Before said rehearing came on to be heard *Radke* filed a claim in the matter of the estate, in which, among other things, he alleged that his mother and father had entered into an agreement some time after his birth by which the mother agreed to provide the claimant with a home, to furnish him the necessaries of life, to give him an education, and to look after his wants generally, until he should be able to support himself and until he should arrive at the age of seventeen years; that in consideration therefor the father was to pay to the claimant, upon his arrival at the age of twenty-one years, the reasonable cost and value of such support, care, and education, and that it was agreed that the reasonable cost thereof would be the sum of $200 per annum; that thereafter said agreement was modified so that the amount should become payable at the time of the death of the deceased in place of claimant's arrival at the age of twenty-one years.    Contemporaneously with the filing of the aforesaid claim the mother also filed a claim, based upon allegations similar to those contained in the son's claim.

The matter of the hearing on the petition of *Radke* to set aside the probate of the will and the hearing on the aforesaid claims filed was set for the first Tuesday of August. At such hearing the claimant, *Radke,* was permitted to amend his claim and to allege that the father, instead of agreeing to pay the sum of $3,400 at the time of his death,

agreed that he would make a will or other provision by which at the time of his decease all of his property would go to the son. The inventory filed shortly before the hearing showed an appraised valuation of about $22,000, and this amount was claimed by the claimant on account of the alleged breach by the deceased of said contract. The mother's claim was withdrawn at the hearing.

Further facts will be stated in the opinion.

*F. J. Smith* of Merrill, for the appellant.

For the respondent there was a brief by *J. & M. Van Hecke* of Merrill, and oral argument by *John Van Hecke.*

DOERFLER, J. If the testimony of the mother be believed, the deceased at all times manifested extreme solicitude for the welfare of his child, and yet from the time of the latter's birth, up to the time of the death of the deceased, not a penny did he contribute for his education or support. The mother for nine years after the birth of the child lived in dire poverty. To sustain herself and her infant she was obliged to perform hard menial labor. She testified that the deceased repeatedly offered to contribute money to the child's education and support during this period, but that she never applied for or accepted anything. It being quite definitely established by the evidence that the deceased was the father of this child, and the court having so found, it is inconceivable and nigh incredible that such aid was either proffered or that she should have refused it. Like all other evidence, that given by the mother on the important issue must, in order to establish its credibility, be harmonized with all the surrounding facts and circumstances in the case and the actual physical situation as it existed. For a period of many years she claims that she met the deceased at least every week or every two weeks, and upon each of such occasions she asserted that the deceased reiterated the agreement, and promised to perform provided she did likewise. No other subject was discussed or was involved in any one of these

numerous meetings, and yet no witness was called to corroborate the fact that any of these meetings actually took place.   It is possible, of course, that these meetings may have been clandestine and that no one actually became aware of their occurrence, but that such is the fact is highly improbable.   That the child was the illegitimate child of Miss Radke, now Mrs. White, was a fact well known in the community in which she resided.   That it was claimed that Dereg was the father was equally well known and was admitted by him.   There was therefore no plausible reason why these meetings should have taken place in secret.

In addition to the oral communications which passed between the parents, as testified to by the mother, she also claimed that a regular course of correspondence was maintained between them, and that each letter received from the deceased contained an affirmation and reiteration of the contract, in which she was admonished to comply with her part of the agreement, he assuring her that he would absolutely perform his part.   Not a single letter was introduced in evidence, because, as she claimed, these letters were destroyed by her shortly after her marriage to White.   And yet these letters would have constituted, had they been produced, the best possible evidence to establish the agreement.   She was permitted to establish the contents of these letters by her oral testimony, based upon her memory.   If it be true that such letters were actually received, it is highly improbable that she would have failed to realize their importance and the bearing they would have upon an issue as herein presented.   It must be admitted that her excuse for destroying the letters has some plausibility, for she took the position that she was unwilling to have them come to the notice of her husband.   However, the husband knew of the illegitimacy of this child and of the claim that Dereg was his father.   Assuming that these letters contained no other substance than that which the mother testified to, it can hardly be said that the husband could have entertained any suspicion

upon the subject. But, it being conceded that the birth of this illegitimate child was a matter of common notoriety in the community where the parties resided, it is highly improbable that these numerous written communications should have been received by her without her submitting them to some friend, relative, or acquaintance, so as to enable some one to testify to their contents and thus create a strong link of corroboration. Not a single witness was called to testify to the contents of these letters excepting the mother.

Dereg for many years after the birth of the child lived in the same community in which the mother resided. His paternity of the child was well known and was conceded by him. If the mother's testimony be taken as true, he manifested a continuous, profound solicitude for the welfare of the child. Nevertheless, not a single witness was called upon the stand who testified or who could testify that the deceased had ever made a statement by which he recognized his obligation under the oral or the written agreement. After the death of the deceased the lock box in which was contained his valuable papers was searched, and a search was made for documentary evidence which might tend to throw some light upon the issue here involved, and not a single letter or other written document was found. No prior will was discovered which evidenced a disposition to leave anything to the son. So that, viewing the evidence adduced upon the hearing, the actual physical facts and the surrounding facts and circumstances seriously discredit the testimony of the mother.

But, above all, the original verified claim of the claimant was materially altered by the amendment at the hearing. The sole knowledge that the son had of the agreement was derived from the mother, after the death of the deceased. Claimant took the position that the mistake made in the original claim was due to a misunderstanding on the part of his counsel, and yet counsel took the stand and under oath testified that the claim was read to the claimant; that the latter swore to the same, and that it was thereafter filed.

While the claim was filed in the month of March, no attempt was made to amend it until four months afterwards, when the hearing took place. The amendment was so radically and materially different from the original claim that it appears highly improbable that any party in any way connected with this claim could have been guilty of making a mere mistake. The claim for $3,400, based upon an agreement to pay at the rate of $200 per annum at the time of the death of the deceased, is vitally and materially different from a claim by which the deceased agreed to leave the claimant all of his property, which, according to the appraisal in the inventory, was valued at the sum of $22,000.

The learned trial judge in his opinion and in his findings ruled that the mother was an incompetent witness under the provisions of sec. 4069 of the Statutes, and that her testimony as to the agreement was therefore improperly admitted. Whether he was right or wrong in his decision we need not determine. Assuming her competency as a witness, we are convinced beyond controversy that under all the facts and circumstances in the case, and particularly in view of the actual physical situation existing, her testimony is incredible and unworthy of belief; and this is particularly so in view of the fact that the lips of the deceased have been sealed by death, thus preventing him from contradicting any of the mother's testimony. If, under the evidence here disclosed, the deceased could be deprived of his entire estate and thus prevented from disposing of his property in accordance with his wishes; or, on the other hand, if the claim were to be allowed in accordance with the original claim filed, then the estates of deceased persons would readily become the subject of loot by unconscionable and designing individuals, and no protection whatever would be afforded a decedent's property. Such testimony must be scrupulously scanned and considered in view of the great possibility for the perpetration of fraud. *Wallace v. Rappleye,* 103 Ill. 229;

Will of Dereg, 187 Wis. 425.

The evidence introduced to set aside the probate of the will on the ground that the testator was insane or mentally incompetent was extremely weak and unconvincing, all of which is practically conceded in the brief of the learned counsel for the appellant. The court therefore rightly decided that the will was properly admitted to probate.

The record discloses that a prior motion had been granted to the claimant for a continuance in order to enable him to produce certain witnesses residing in the state of Michigan. The witnesses did not appear at the hearing. Before the argument was made at the close of the hearing, appellant's counsel received a letter from these witnesses containing a statement that valuable evidence could be furnished by them which would corroborate the agreement contended for by the claimant. No application, however, was made for a continuance, and in due time the court rendered its decision. An application was thereupon made to the court to reopen the case and for a further hearing to enable the production of such witnesses. The affidavits of these witnesses were not produced upon the hearing of the application. No effort was made to take their depositions. The court ruled that ample time had been afforded to produce the necessary evidence, and it thereupon exercised its discretion and denied the application. It would appear to us that the discretion was properly exercised; at any rate, we cannot say that the court abused its discretion.

The judgment of the lower court must therefore be affirmed, together with the order of the court denying a new trial on the ground of newly-discovered evidence.

*By the Court.*—It is so ordered.